IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF GIAVONNA G.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF GIAVONNA G., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MARIO G., APPELLANT.

Filed October 22, 2019.    No. A-18-888.

Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Anne E. Troia, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, and Debra Tighe-Dolan for appellee.

MOORE, Chief Judge, and PIRTLE and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

Mario G., natural father of Giavonna G., appeals the order of the Douglas County Separate Juvenile Court terminating his parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and finding that termination was in Giavonna's best interests. Based upon the analysis set forth herein, we affirm.

## STATEMENT OF FACTS

Due to the lengthy procedural history of this case, we focus only on the portion relevant to this appeal. This case began as an educational neglect case involving Giavonna, her mother, and her mother's other children. The original second amended petition, filed in February 2013, alleged

Giavonna came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) because a caseworker had observed the family home "to be in a filthy, unwholesome manner with the basement littered with cat feces placing the children at risk of harm." Giavonna's father, Mario, did not live in the same residence as the children when they were removed. The caseworker's affidavit in support of removal reported that Mario had been charged with physically abusing Giavonna's maternal brother. The original placement order stated that placement should exclude the homes of Giavonna's mother and Mario, and the State amended the petition to allege that Mario failed to provide safe, stable, and/or appropriate housing, parental care, support, and supervision of Giavonna and that she was at risk of harm.

By August 2014, the State filed a second motion for termination of parental rights alleging that Giavonna came within the meaning of Neb. Rev. Stat. § 43-292(2), (6), and (7) (Cum. Supp. 2014) and that termination of Mario's rights was in Giavonna's best interests. A hearing on the State's motion for termination was held during 3 days in January, March, and April 2015. The evidence presented during that hearing is documented in *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016), and we will not repeat it here. In an order filed on May 8, 2015, the juvenile court terminated Mario's parental rights pursuant to § 43-292(2), (6), and (7) and found that termination was in Giavonna's best interests. Mario appealed that decision to this court and we analyzed the evidence as more fully set forth in *In re Interest of Giavonna G., supra.* Following our de novo review, we ultimately reversed the juvenile court's order terminating Mario's parental rights holding:

> Upon our de novo review, we conclude that while this case is a "close call," Mario's assertions do have merit. We fully recognize that Mario has made improvement but still has work to do before achieving reunification with Giavonna. In particular, we point to the need for Mario to demonstrate the ability to maintain sobriety and stability in visitation, and to comply promptly with any applicable court orders.

*In re Interest of Giavonna G.*, 23 Neb. App. at 867, 876 N.W.2d at 431.

In June 2017, the court held a hearing on Mario's motion for unsupervised visits. During that hearing, Justice Braimah, a behavioral health and wellness advocate, testified that he told Mario to come to terms with his situation and attend "an actual parenting class." Braimah further testified he told Mario to maintain a relationship with Giavonna's maternal grandmother and foster parent for the sake of Giavonna.

On August 2017, the court held an adoption review and permanency hearing. During that hearing, Shelagh Hardrich, a temporary case manager, testified reunification with Mario was not in Giavonna's best interests. Hardrich explained her opinion was based on the reports of the family therapist that detailed the existence of a strong bond between Giavonna and her grandmother, Mario's disapproval of an ongoing relationship between Giavonna and her grandmother, and Mario's need for more individual therapy before starting family therapy. Jessica Michalski, a family permanency specialist, testified therapy remained a big barrier to reunification. Mario was provided with information for Region 6 providers and was offered monetary assistance to pay for a therapist. Despite the court order issued in August 2017 mandating therapy, Mario did not use the services offered until 1 month prior to the hearing in January 2018. Michalski testified Giavonna stated on several occasions that she wanted to be adopted by her grandmother. Regarding

drug testing, Michalski testified Mario was only completing 60 percent of the court-ordered urinalysis testing.

In February 2018, during an adoption review and permanency hearing, similar reports indicated that for over 120 days, Mario failed to comply with the court's September 2016 order requiring him to attend individual therapy.

In October 2017, nearly 1½ years following the release of our opinion in *In re Interest of Giavonna G., supra*, the State filed a third motion for termination of Mario's parental rights alleging Giavonna was found to be a juvenile under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016); Giavonna came within the meaning of § 43-292(2), (6), and (7); and that termination of Mario's parental rights was in Giovanna's best interests. A termination hearing was held over 4 days in April and July 2018. The State called witnesses including Dr. Theodore DeLaet, Sarah Valentine, Lisa Heiden, Kathleen Spurgin, Jessica Michalski, and Machaela Hackendahl. Mario called Justice Braimah, a behavioral health and wellness advocate, and several visitation workers, Jaclyn Rahaman, Dawnisha Bullion, and Samuel Crawford, who testified regarding Mario's interactions with Giavonna.

Dr. DeLaet, a self-employed psychologist, testified that he conducted a court-ordered forensic evaluation on Mario. After completing eight sections of the evaluation, Mario became frustrated and refused to finish the evaluation. Dr. DeLaet computed Mario's test results by using the eight sections Mario had completed, and explained the results showed Mario had an intelligence quotient in the 20th percentile, his verbal comprehension score indicated a learning disability, and he manifested depressive symptoms. Dr. DeLaet also testified that the personality testing indicated Mario often feels he is being punished without cause and is being plotted against.

In connection with his forensic evaluation, Dr. DeLaet provided Mario with a self-reporting test wherein Mario could self-report his perceived levels of impairment with certain functioning on a scale of zero to nine, zero meaning no impairment and nine meaning extremely impaired. Dr. DeLaet testified that people who feel that they are fairly well-functioning will typically mark between a one to a three on the zero- to nine-point scale. However, Mario listed zeroes for every answer, claiming he had no impairments with daily functioning, including parenting tasks. Additionally, in a substance abuse screening to describe his alcohol and drug use in the last 4 years, Mario listed zeroes despite having recently failed a drug test indicating the presence of marijuana in his system. Dr. DeLaet testified Mario likely suffered from a personality disorder consistent with narcissistic and antisocial traits. He explained narcissistic traits mean focusing on the self, not others, and antisocial traits indicate a problem with rules, authority, and structure. Dr. DeLaet testified Mario also suffers from a cannabis use disorder, which was consistent with a prior evaluation. Dr. DeLaet testified that although Mario believed that he did not need treatment, Dr. DeLaet concluded Mario needed treatment and further drug testing.

Sarah Valentine, drug supervisor of Owens and Associates, testified regarding Mario's court-ordered random urinalysis testing from April 2017 to April 2018. Mario was unsuccessful on 45 out of 108 tests taken. The designation of an "unsuccessful" test means refusing to test, a scheduling conflict, or failing to provide enough urine for the test; however, an unsuccessful test does not indicate drugs were found in the urine. A successful test denotes that enough urine was provided for a sample.

In August 2017, the juvenile court ordered Mario to attend individual therapy. Kathleen Spurgin and Lisa Heiden testified about therapy sessions they had with Mario. Kathleen Spurgin, a licensed therapist, met with Mario seven times between January and March 2018. Spurgin testified that typically, by the third therapy session, treatment goals are identified. However, Spurgin testified Mario could not identify issues to work on during therapy, so no therapy goals were set. Spurgin conducted a biopsychosocial assessment and diagnosed Mario with adjustment disorder. Spurgin later unsuccessfully discharged Mario from individual therapy in April 2018.

Heiden, a private therapist for the minor child, testified she met with Mario in August 2017 to assess his parenting skills. Heiden testified she asked Mario questions detailing problematic behaviors a child may exhibit to see how Mario would handle those situations. She testified that Mario was unable to identify skills he would use to address those behaviors and stated he would not have consequences for those behaviors. According to Heiden, Mario stated if there was reunification between him and Giavonna, he would terminate Giavonna's relationship with her grandmother, who had served as her long-time foster parent. By that time, Giavonna had lived with her grandmother for nearly 5 years and Giavonna had expressed her desire to be adopted by her grandmother on several occasions. Heiden testified to the importance of Giavonna maintaining a relationship with her grandmother. Heiden also testified she did not provide family therapy to Mario because he informed her that he did not need family therapy. Heiden testified it is important for individuals to participate in family therapy sessions in order to meet their therapy goals.

Jessica Michalski, a family permanency specialist, testified it was in Giavonna's best interests for Mario's parental rights to be terminated. Michalski testified that factors she considers in making a best interests determination include: (1) the safety of being placed with the parent, (2) the well-being of the child, (3) the desires of the parent, (3) the desires of the child, and (4) other professionals' opinions regarding the best interests of the child. Michalski further testified that she relied on court orders, the progress of Mario and Giavonna, and opinions from professionals working with Mario and Giavonna. Michalski testified that no progress has been made concerning reunification and noted Mario was unwilling to cooperate with court orders other than supervised visits. Michalski testified that in October 2017, Mario told her he was not attending individual therapy. Michalski further testified that when she discussed individual therapy with Mario, he did not understand why he had to attend therapy. Michalski testified that Mario admitted to using marijuana for his back pain in May or June 2016. Michalski also testified that she asked Mario in March 2016 to provide proof that he was employed; almost 2 years later, on February 2018, he provided a W-2. Michalski testified Giavonna is 7 years old and currently resides with her grandmother and half siblings in the only home she has known for the past 5 years.

Machaela Hackendahl, a clinical therapist at Child Saving Institute, testified regarding her therapeutic interactions with Giavonna. Hackendahl testified that after working with Giavonna from 2016 to 2017, she discharged Giavonna from therapy because of the progress she made, such as verbally stating how she felt at different times and using coping skills on a regular basis. Hackendahl testified that in early 2017, she made a referral for Giavonna and Mario to attend family therapy. However, Mario did not engage with Hackendahl regarding Giavonna's therapeutic goals. This lack of engagement concerned Hackendahl because a group of caregivers is required to help a child grow and process any attachment issues or trauma.

Mario called Justice Braimah who testified that Mario first met with him for individual therapy in January or February 2017. Braimah testified that parenting was a major topic in therapy, and he encouraged Mario to attend parenting classes with Giavonna's grandmother. Even though Mario attended therapy for a period of time, Braimah did not successfully discharge Mario.

Mario also called several visitation workers who observed his visits with Giavonna. Jaclyn Rahaman, program director at Family Development Services, testified that she supervised a visit in December 2016 and noted Giavonna ran to Mario and gave him a big hug. She also testified there were no safety concerns during the supervised visits, Mario provided Giavonna with a meal, and he was fully engaged with her during the visits. Dawnisha Bullion, a visitation specialist with Family Development Services, observed Giavonna give Mario a hug, Mario provide Giavonna a meal, and Mario also planned activities for Giavonna. Bullion testified she did not have any safety concerns. Finally, Samuel Crawford, a visitation specialist, testified he had no safety concerns, and Mario provided Giavonna with a meal. Crawford also testified Giavonna is close to Mario and is happy to see him.

In August 2018, the juvenile court issued its order finding that there was clear and convincing evidence that Giavonna was within the meaning of § 43-292(2), (6), and (7) and that it was in the best interest, safety, and welfare of Giavonna that Mario's rights be terminated. Mario appeals the juvenile court's decision to terminate his parental rights.

## ASSIGNMENTS OF ERROR

Mario contends that the juvenile court erred in finding that the State proved by clear and convincing evidence that his parental rights should be terminated pursuant to § 43-292(2) and that termination was in Giavonna's best interests. Mario also assigns as error that the juvenile court erred in finding that the State proved by clear and convincing evidence that his parental rights should be terminated pursuant to § 43-292(6); however, he did not argue this assigned error in his brief. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *In re Interest of Reality W.*, 302 Neb. 878, 925 N.W.2d 355 (2019).

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *Id.* When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016); *In re Interest of Becka P.*, 27 Neb. App. 489, ___ N.W.2d ___ (2019).

## ANALYSIS

### STATUTORY BASIS FOR TERMINATION

Although Mario does not contest the juvenile court's determination that the State proved by clear and convincing evidence that his parental rights should be terminated pursuant to § 43-292(7), for the sake of completeness on our de novo review, we briefly address these statutory grounds.

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Mario's parental rights to Giavonna, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) (substantial and continuous or repeated neglect), § 43-292(6) (having determined child was juvenile as described in § 43-247(3)(a), reasonable efforts to preserve and reunify family had failed to correct conditions leading to determination); and § 43-292(7) (child out-of-home for 15 or more months of most recent 22 months).

Giavonna was in an out-of-home placement continuously since April 26, 2013. At the time the third motion to terminate Mario's parental rights was filed on October 16, 2017, Giavonna had been in an out-of-home placement for a total of 53 months. And as of the last day of the termination hearing on July 16, 2018, she had been in an out-of-home placement for a total of 62 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Mario's parental rights under § 43-292(7) were proven by sufficient evidence.

We need not consider whether termination of Mario's parental rights was proper pursuant to § 43-292(2) or (6), since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S., supra*.

BEST INTERESTS

Mario also contends that the juvenile court erred in finding that it was in Giavonna's best interests to terminate his parental rights.

In *In re Interest of Becka P.*, 27 Neb. App. 489, 508-09, ___ N.W.2d ___, ___ (2019), this court recently stated:

In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

In cases where termination of parental rights is based on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

The last time the case was before the court, we determined Mario had made progress and demonstrated a willingness to reunite with Giavonna through his visitations and relationship with her. However, we also cautioned that the record in *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016), presented a "close call" in relation to termination and that Mario needed to do more work before reunifying with Giavonna including, but not limited to, promptly complying with any applicable court orders. While the testimony of the visitation workers in the present action continue to support Mario's efforts in visiting with Giavonna and establishing a relationship with her, Mario has consistently and systematically failed to comply with the juvenile court's orders.

In the present action, Mario had been ordered to complete a psychological evaluation, submit to random urinalysis testing as requested, and attend individual therapy on a consistent basis. Mario has largely failed to comply with these requirements and appeared defiant in the process. For instance, Mario became upset and prematurely ended the court-ordered psychological evaluation with Dr. DeLaet. Dr. DeLaet testified he calculated Mario's test results by using the sections Mario completed. Dr. DeLaet explained that the results showed Mario had an intelligence quotient in the 20th percentile, his verbal comprehension score indicated a learning disability, and he manifested depressive symptoms. Dr. DeLaet testified Mario likely suffers from a personality disorder consistent with narcissistic and antisocial traits. Dr. DeLaet also testified Mario suffers from a cannabis use disorder and further drug testing is needed. Dr. DeLaet concluded Mario needed treatment, but Mario believed he did not need treatment.

Mario was also inconsistent with drug testing. Valentine testified regarding Mario's court-ordered random, urinalysis testing from April 2017 to April 2018. Out of the 108 tests taken, 45 were unsuccessful meaning Mario refused to test, had a scheduling conflict, or failed to provide enough urine for the test.

Mario also failed to fully participate in individual therapy ordered by the juvenile court in August 2017. Spurgin testified regarding individual therapy sessions she had with Mario. Spurgin testified she met with Mario seven times between January and March 2018. During therapy, Spurgin diagnosed Mario with adjustment disorder but testified no therapy goals were set because Mario could not identify issues to work on during therapy. Spurgin later unsuccessfully discharged Mario from individual therapy in April because he did not engage in therapy.

The juvenile court judge, in his thoughtful order, provided the following in connection with his best interests analysis:

The court acknowledges that it struggles with this prong of the analysis.

The struggle is that the evidence clearly supports that Gia loves her father and he has been consistent in visiting Gia. The evidence also supports that Gia is excited to see her father. The consistent visitation by the father and Gia's excitement to see her father would make the best interest prong easier if these were the only considerations. They are not as the court must not ignore its findings under 43-292 (2)(6) and (7) noted above.

Gia has been subject to the court's jurisdiction since April 26, 2013. At no time has the legal or physical custody been returned to the father. For whatever reason(s), Mario[, the father,] has not put himself in a position to parent Gia. Existing case law does not require that his conduct and noncompliance be willful. Rather, for whatever reason, he has been unable to do so. (See *In re Interest of Joshua M.,* 251 Neb 614, 558 NW2d 548 (1997)).

Reasonable efforts have been provided to achieve compliance with material provisions of the father's rehabilitation plan. The court cannot find that completing the psychological evaluation and therapy ordered are immaterial. Further, the evidence supports that repeated reasonable efforts provided over the period of time that he and his daughter have been under the court's jurisdiction to achieve the twin goals of rehabilitation and reunification have not been successful. (See exhibits 121, 128, 146, and 153.)

Specifically, a psychological evaluation and therapy were ordered. He has not successfully completed these items. In fact, compliance has been met with defiance on the part of the father as the evidence supports that he outright refused to return to complete his psychological evaluation with Dr. Theodore [DeLaet].

The court is also mindful that while reasonable efforts are relevant to 292 (6) and (7), a rehabilitation plan established under the supervision of the court does not relieve [Mario] of his obligation to take self-help measures to achieve rehabilitation with respect to 2, 6 and/or 7. His failure to comply with the rehabilitation plan, to take independent measures, and/or to demonstrate sustained, material progress has essentially resulted in Gia remaining suspended in a foster care setting for an indeterminate amount of time. The evidence presented does not reveal imminent reunification.

This prolonged suspension into foster care also demonstrates substantial and continuous or repeated neglect in providing necessary parental care and protection. Likewise, such a prolonged and indeterminate length of time suspended in foster care is not consistent with Gia's best interests and supports the independent finding that termination is in Gia's best interest, safety and welfare.

After de novo review of the record, we echo the remarks of the juvenile court judge. The same reasons that gave this court pause in 2016 in connection with *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016), are present again. However, a parental bond alone does not make the parent a fit person to provide parental care for their child. See *In re Interest of Alec S.*, 294 Neb. 784, 797, 884 N.W.2d 701, 709 (2016). The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of the statute, and is also through a determination of the child's best interests. *In re Interest of Nicole M.*, 287 Neb. 685, 704, 844 N.W.2d 65, 80 (2014). Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.* This record and the record in *In re Interest of Giavonna G., supra*, provide clear and convincing evidence of Mario's personal deficiencies which have prevented the performance of a reasonable parental obligation in child rearing for Giavonna which has caused, or probably will result in detriment to Giavonna's well-being, notwithstanding his relationship with her, and

we cautioned Mario in *In re Interest of Giavonna G., supra*, of the importance of complying with court orders in connection with overcoming his deficiencies and in order to reunify with Giavonna. Instead, Mario chose not only to disregard court orders and the plan, but as the juvenile court recognized, appeared defiant in doing so.

"Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights." *In re Interest of Becka P.*, 27 Neb. App. 489, 511, ___ N.W.2d ___, ___ (2019). Furthermore, "Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *Id*.

The court-ordered services were intended to rehabilitate Mario and to reunite him with Giavonna; however, his unwillingness to comply with these services now over 5 years removed from the commencement of these proceedings prevent him from meeting the court-ordered requirements. Thus, we find there was clear and convincing evidence that shows Mario is unfit as a parent and that terminating his parental rights was in Giavonna's best interests.

CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Mario's parental rights to Giavonna.

AFFIRMED.